UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VICTORY RECORDS, INC., and ANOTHER VICTORY, INC., | ) ) ) | |
| | ) | 08 C 3977 |
| Plaintiffs, | ) ) | Judge Feinerman |
| vs. | ) ) | |
| VIRGIN RECORDS AMERICA, INC., a division of EMI Music North America, | ) ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Victory Records, Inc. and Another Victory, Inc. (together, "Victory") filed this diversity action against Defendant Virgin Records America, Inc., alleging that Virgin tortiously interfered with Victory's multi-album recording, publishing, and merchandising contract with the rock band Hawthorne Heights. But for Virgin's alleged interference, Victory claims, the sales of Hawthorne Heights's second and third albums would have been substantially higher than they actually were and Victory would have released a fourth Hawthorne Heights album to comparable success. Victory seeks several million dollars in compensatory damages and $25 million in punitive damages. Trial is set to commence on February 7, 2011.

Virgin has moved *in limine* to exclude the testimony of Victory's proposed damages expert, music industry accountant Bruce Kolbrenner. The court heard extensive argument at a hearing on January 6, 2011, and informed the parties at the pretrial conference of January 31, 2011, that the motion would be granted. This memorandum sets forth the grounds for granting the motion.

Federal Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of opinion or otherwise." Fed. R. Evid. 702. The rule requires that "(1) the testimony must be based upon sufficient facts or data; (2) it must be the product of reliable principles and methods; and (3) the witness must have applied the principles and methods reliably to the facts of the case." *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 824 (7th Cir. 2010); *see also Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579 (1993). The district court serves as the "gate-keeper who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert." *Winters v. Fur-Con Inc.*, 498 F.3d 734, 741-42 (7th Cir. 2007) (citation and internal quotation marks omitted). The expert's proponent bears the burden of proving by a preponderance of the evidence that the testimony satisfies Rule 702. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

Kolbrenner proposes to testify regarding the profits Victory allegedly lost on Hawthorne Heights's second and third albums, which Victory released, and on a fourth album the band was supposed to but did not release under Victory's label. As Victory explains (*see* Doc. 90 at 22-25), Kolbrenner calculated lost profits using the "before and after" methodology, which examines a plaintiff's past profits in estimating its future profits, and the "yardstick" methodology, which examines the profits of closely comparable businesses in estimating a plaintiff's future profits. *See Park v. El Paso Bd. of Realtors*, 764 F.2d 1053, 1068 (5th Cir. 1985). Both methodologies have been accepted in music industry tortious interference cases. *See Slip-N-Slide, Inc. v. TVT Records, LLC*, 2007 WL 3232274, at *11 (S.D. Fla. Oct. 31, 2007); *TVT Records v. Island Def Jam Music Grp.*, 250 F. Supp. 2d 341, 350 (S.D.N.Y. 2003). That

said, when an expert uses either or both methodologies, "[h]is assumptions and projections must rest on 'adequate bases,' and cannot be the product of mere speculation." *Park*, 764 F.2d at 1067 (internal quotation marks omitted); *see also United States v. Brown*, 7 F.3d 638, 652-53 (7th Cir. 1993) ("expert testimony [must] be rejected if it lacks an adequate basis in fact"). Accordingly, if the "principal assumptions" underlying Kolbrenner's opinions lack the reliability expected by experts in the field, his lost profits calculations do not satisfy Rule 702. *Park*, 764 F.2d at 1067; *see also Junk v. Terminix Int'l Corp.*, ___ F.3d ___, 2010 WL 4978801, at *7 (8th Cir. Dec. 9, 2010) (affirming exclusion of expert testimony due, in part, to expert's "reliance on unfounded assumption in his comparative method"); *Universal Church v. Geltzer*, 463 F.3d 218, 226 (2d Cir. 2006) (reversing admission of expert testimony due, in part, to expert's unjustified assumption that debtor's "expenses were essentially the same each year").

To determine projected sales for Hawthorne Heights's second album—that is, what the sales would have been absent Virgin's alleged tortious interference—Kolbrenner began with the units of the second album that Victory shipped to stores, added the number of digitally downloaded tracks, and applied the rate of return that Victory experienced on the first album. *See* Kolbrenner Report (Doc. 86-2) at 7 (projecting 1,089,318 in sales for the second album by adding 1,163,602 "gross units sold" to 25,610 "equivalent digital tracks," and then applying the 8.4 percent return rate from the first album); Kolbrenner Dep. (Doc. 86-4) at 175 (explaining that 1,163,602 "gross units sold" figure was the number of "units that [Victory] management provided to me which indicated the number of units that were shipped"); *id*. at 193 (agreeing that "the calculation of lost profits that [he] ha[s] provided for [the second album] was based upon units shipped"); *id*. at 202 (when asked whether, "to reach a projection for [the second album], you took the units shipped for that record, applied the return percentage from [the first album] to

reach your number," Kolbrenner responded, "[i]n addition to equivalent [digitally downloaded] tracks that were added to it"); *id*. at 217 (agreeing that he applied "the return percentage" for the first album in projecting sales for the second album). That figure (1,089,318) reflected the low end of Kolbrenner's sales projections for the second album; Kolbrenner calculated the median and high ranges (1,500,000 and 2,000,000 units, respectively) based on the sales experience of Paramore, another rock band. *See* Kolbrenner Report (Doc. 86-2) at 5, 8-9 (which sets forth the low, median, and high ranges, but does not mention Paramore); Kolbrenner Dep. (Doc. 86-4) at 204 (explaining that he "looked at a comparison with Paramor[e], a comparative artist, who is in a similar genre, and was on an independent label, Fueled by Ramen, and took a look to see what happened in the second album."); *id*. at 211 (agreeing that "the sales results of Paramor[e] provided some foundation for [his] methodology in calculating low, median and high sales figures"). To determine projected sales for the third and fourth albums, Kolbrenner applied a 25 percent reduction and 33 percent reduction, respectively, to the projections for the second album. *See* Kolbrenner Report (Doc. 86-2) at 11-13, 15-17; Kolbrenner Dep. (Doc. 86-4) at 246-47. And to determine profit per projected unit for all three albums, Kolbrenner applied the per-unit profit ($3.21) from the first album as the low end, and increased that figure ten percent (to $3.53) and fifteen percent (to $3.69) for the mid and high ranges. *See* Kolbrenner Report (Doc. 86-2) at 5, 8-9, 11-13, 15-17; Kolbrenner Dep. (Doc. 86-4) at 217.

While Kolbrenner's methodology may be opaque in certain respects, one aspect is crystal clear: the starting point for the lost profits analysis for the second album, and thus for the third and fourth albums, is Kolbrenner's assumption that Victory shipped the correct number of units for the second album—in other words, his assumption that Victory's internal sales projections were correct. As noted above, when an expert premises his opinions on an assumption, the

-4-

assumption must be reliable. *See Junk*, 2010 WL 4978801, at *7; *Universal Church*, 463 F.3d at 226; *Park*, 764 F.2d at 1067-68. The Seventh Circuit has held, however, that an assumption based on the internal projections of the expert's sponsor lacks the reliability demanded by Rule 702. *See Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 420 (7th Cir. 2005) (a party's "internal projections … rest on its say-so rather than a statistical analysis," and "represent hopes rather than the results of scientific analysis"); *see also ZF Meritor LLC v. Eaton Corp.*, 646 F. Supp. 2d 663, 667 (D. Del. 2009) (excluding testimony of expert who "did not apply his own assumptions, based upon his expertise, to any financial data in order to project" the party's future performance, but who instead "relied on" the party's own internal financial projections "without knowing … the validity of the underlying data and assumptions upon which the [projections] were based"). This is particularly so where, as here, the proposed expert offered no basis in the two-page narrative portion of his expert report (Doc. 86-2 at 7-8) or at his deposition (Docs. 86-3 & 86-4) for concluding that Victory's internal projections provide an acceptable foundation for an expert's opinion in his field. Thus, while opinion testimony regarding damages founded on a party's internal projections might be permissible when delivered by a lay witness under Federal Rule 701, *see United States v. Valencia*, 600 F.3d 389, 416 (5th Cir. 2010); *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 81 (3d Cir. 2009); *DIJO, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679, 687 (5th Cir. 2003); *MCI Telecomms. Corp. v. Wanzer*, 897 F.2d 703, 705-06 (4th Cir. 1990), it may not be delivered by a witness with the gloss of expertise under Rule 702.

The expert testimony admitted in *Slip-N-Slide Records* and *TVT Records* does not suffer from this flaw. In neither case did the expert adopt the client's internal sales projections as his own; instead, the experts employed the "before and after" and "yardstick" methodologies to

calculate the record company's projected future sales and, from there, lost profits. *See Slip-N-Slide Records*, 2007 WL 3232274, at *13 (album sales by comparable artists provided "a track record upon which an expert could base projections of sales of the [relevant] album"); *TVT Records*, 250 F. Supp. 2d at 349-50 ("While the Court agrees that [the relevant band's] presence in the marketplace at this time is quite limited, that of Ja Rule is, as [Defendant] itself argues elsewhere, quite extensive. Because Ja Rule is one of only three members of [the relevant band], it is reasonable to rely, as Kolbrenner does, on Ja Rule's popularity and the performance of his solo albums as a basis to project [the relevant band's] [a]lbum sales."). Accordingly, the *Slip-N-Slide Records* and *TVT Records* courts were justified in holding that the expert's sales projections, and the lost profit calculations derived therefrom, were sufficiently reliable under Rule 702. *Compare 24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 514 F. Supp. 2d 571, 575 (S.D.N.Y. 2007) (testimony excluded where expert did not "explain how he translated 24/7's financial solvency, successful exploitation of artists and music industry notoriety, and relationship with [other companies] into dollar figures"); *Rondor Music Int'l Inc. v. TVT Records LLC*, 2006 WL 5105272, at *3-5 (C.D. Cal. Aug. 21, 2006) (expert's reliance on band's "star power," "past success," and "overall marketing" efforts insufficient where she "did not have a statistical basis" for the sales projection).

    Kolbrenner's damages opinion is deficient in a second, independent respect. As noted above, and as Victory acknowledges, "Kolbrenner applied the yardstick method by drawing upon the record sales of a comparable band, *Paramor[e]*, on an independent label as one of the foundations for his methodology in calculating low, median and high sales figures." Doc. 90 at 22. Kolbrenner's "yardstick," then, rests on a single comparable. *See* 1/6/11 Tr. at 120, 133-34 (Victory's counsel concedes that Kolbrenner used one comparable, Paramore); Kolbrenner Dep.

(Doc. 86-4) at 204. Although "[d]etermining the minimum sample size from which reliable extrapolations can be made to the sampled population is tricky, … a sample size of one is rarely, if ever, sufficient." *Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 818 (7th Cir. 2010) (internal quotation marks omitted); *compare Slip-N-Slide Records*, 2007 WL 3232274, at *13 (approving "yardstick" testimony where the expert "compared sales of eight other albums marketed and released by [the plaintiff recording company] of similar genre artist"). Nowhere does Kolbrenner or Victory even attempt to establish that a sample size of one band is an appropriate "yardstick" among recording industry experts for measuring future performance of another band.

Exacerbating matters, Kolbrenner selected Paramore based not on his own expertise or analysis, but at the direction of Anthony Brummel, Victory's CEO and owner. This fact, as well as the importance of Paramore to Kolbrenner's overall opinion, is clear from his deposition:

> Q. Who made the determination that Pa[ramore] was a … group that you should look at as a comparable group?
>
> A. I believe Tony did.
>
> Q. Okay. Did you at any point make suggestions as to bands that you thought should be considered as potential comparable artists?
>
> A. No.
>
> Q. Okay. Was … a comparable artist analysis in your view necessary in order for you to render your request?
>
> A. It was part of my overall analysis … in order to render the report.

Kolbrenner Dep. (Doc. 86-4) at 271-72. An email exchange between Brummel and Kolbrenner confirms the point. In October 2009, Brummel wrote to Kolbrenner: "This is the band that we want to focus on re: HH comparisons: Paramore's Brand New Eyes enters at #2, surpassing the

#15 peak of their last album, 2007's platinum release Riot!" Doc. 83-11. Kolbrenner responded: "Great Tony! Please advise why this is the case. Need as much detail as possible!" *Ibid*. Having been asked for "as much detail as possible," Brummel replied: "Same demographic, fans, started at the same time etc. Paramore is THE band to compare with." *Ibid*. Given this rather paltry foundation, even if an expert could conduct a "yardstick" analysis based on the performance of a single comparable band, Kolbrenner's selection of Paramore as a comparable was not reliable under Rule 702. *See R&R Int'l, Inc. v. Manzen, LLC*, 2010 WL 3605234, at *13 (S.D. Fla. Sept. 12, 2010) ("Under the 'yardstick' test, sampling choice lies at the heart of an expert's methodology … In order to satisfy the scientific sampling standard[, the expert's] samples should have been chosen using some method that assures the samples are appropriately representative of the [plaintiff's] business."); *Allgood v. Gen. Motors Corp.*, 2006 WL 2669337, at *10-11 (S.D. Ind. Sept. 18, 2006) (expert testimony excluded where "samples [were not] chosen using some method that assures the samples are appropriately representative"); *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 811-12 (N.D. Ill. 2005) (excluding testimony where expert did not articulate an adequate basis for selecting the comparables used in the lost profits calculation).

There is a final, independent respect in which Kolbrenner's damages opinion falls short under Rule 702: he failed to consider alternative explanations for the alleged drop in sales of the second Hawthorne Heights album. This is not to say that all damages experts must take account of alternative explanations for a plaintiff's loss. Rule 702 permits an expert, at least in some circumstances, to assume that the defendant's alleged misdeeds caused the plaintiff's loss. *See, e.g.*, *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000); *Harris Wayside Furniture Co., Inc. v. Idearc Media Corp.*, 2008 WL 7109357, at *3-4 (D.N.H.

Dec. 22, 2008). Moreover, even where some alternative explanations must be addressed, an expert need not consider and account for "*each and every possible* cause of a given outcome." *Gayton v. McCoy*, 593 F.3d 610, 619 (7th Cir. 2010) (emphasis added).

Kolbrenner, however, does not simply assume causation; rather, causation is part and parcel of his opinion. In the two-page narrative portion of his expert report, Kolbrenner opines: "The decline in sales of the second album, given the heightened marketing push of Victory, was so substantial that it cannot be explained by general marketing trends in the industry. It can only be attributable to the actions taken by Hawthorne Heights after the wrongful intervention of Virgin." Kolbrenner Report (Doc. 86-2) at 2. At three other points in the narrative, Kolbrenner opines that "[i]t is *reasonable* to assume" that Victory's alleged lost profits were caused by Virgin's interference with the Hawthorne Heights-Victory relationship. *Id*. at 2-3 (emphasis added). And although Victory's opposition brief hinted that Kolbrenner might not address causation if allowed to testify (*see* Doc. 90 at 17, 28-31), Victory's counsel clarified during oral argument that Kolbrenner would in fact opine that Virgin's alleged misconduct caused Victory's alleged losses. *See* 1/6/11 Tr. at 97 ("I don't want to conflate causation on liability, which we're not offering Kolbrenner for, with causation on damages. The causation component of Kolbrenner's testimony is that assuming facts are proven concerning the promotion marketing activities of Victory and the failure of the band to cooperate in those respects with the second album, that those factors, assuming that we prove them to be true, had an impact on the diminished sales on the second album. So damages causation, yes."); *ibid*. ("Mr. Kolbrenner's report said declining sales could not be explained away by factors, other extraneous factors other than the difference in the effect of the band's performance."); *id*. at 105 ("So causation is—falls within the realm of his expertise after 25 years in the music industry.").

Although proffered as an expert on the cause of Victory's lost profits, Kolbrenner failed to consider "obvious alternative explanations" for the second Hawthorne Heights album's disappointing performance. Fed. R. Evid. 702 Advisory Comm. Notes (2000 amends.) (an important benchmark for gauging reliability is "[w]hether the expert has accounted for obvious alternative explanations"); *see also Am. Honda*, 600 F.3d at 817; *Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.*, 521 F.3d 790, 791 (7th Cir. 2008). He should have done so. The evidence shows that Victory was hopeful that the Hawthorne Heights album would edge out an album by the hip-hop artist Ne-Yo to top the *Billboard* charts the week of both albums' release. In an effort to boost Hawthorne Heights's chances, Victory released under Hawthorne Heights's name a so-called "Manifesto," which characterized the competition as a battle between Hawthorne Heights and rock music, on the one hand, and Ne-Yo and hip hop, on the other. The "Manifesto" fell flat and was viewed by some as racist, which put the band in somewhat bad odor. *See* Docs. 86-5 & 86-6; http://www.punknews.org/ article/19052. Victory also sent an email to its "street teams" encouraging them to hide copies of Ne-Yo's CDs at large retail stores in urban areas. *See* Docs. 86-7 & 86-8. As the email explains, the strategy was to depress Ne-Yo's sales, thus making it more likely that Hawthorne Heights would outperform Ne-Yo:

> As for Ne-[Y]o, the name of the game is to decrease the chances of a sale here. If you were to pick up a handful of Ne-[Y]o CDs, as if you were about to buy them, but then changed your mind and didn't bother to put them back in the same place, that would work. Even though this record will be heavily stocked and you might not be able to move all the stock, just relocating a handful creates issues: Even though the store will appear to be out of stock, the computer will see it as in stock and not re-order the title once it sells down and then Ne-Yo will lost a few sales later in the week.

Doc. 86-8 at 3. The email was leaked and published, leading to substantial controversy (not the good kind) in the music world and among fans. *See* Docs. 86-7 & 86-8.

The Manifesto and street team incidents were and remain prominent episodes in Victory's and Hawthorne Heights's respective histories. *See* http://en.wikipedia.org/wiki/Hawthorne_Heights (section entitled "Incident with Ne-Yo"); http://en.wikipedia.org/wiki/Victory_Records (section entitled "Controversy"); Doc. 86-5 (MTV.com article entitled "Hawthorne Heights Deny Ne-Yo Beef, Pick Oreos Over Cristal: Band busy doing damage control after label issues manifesto in its name"). In fact, the incidents led Hawthorne Heights to sue Victory in an effort to terminate its relationship with Victory. *See Bucciarelli-Tieger v. Victory Records, Inc.*, No. 06 C 4258 (N.D. Ill.), Doc. 1 (Complaint), ¶ 1 ("Among other outrageous acts, [Victory CEO Anthony] Brummel … directed Victory personnel and street team members nationwide to enter record stores and intentionally hide another artist's CDs … . Despite the band's lack of knowledge or approval of Brummel's schemes and tactics, Hawthorne Heights has become irreparably associated in the public mind with Brummel's conduct. Indeed, Brummel has intended for Hawthorne Heights to absorb the risk associated with his misguided tactics by widely disseminating, without the band's approval, statements falsely stat[ing] that the band believed it was in some type of war with artists in the hip-hop and R&B music genres, leading many to brand the band as racist.").

Kolbrenner was unaware of the incidents when preparing his report, and thus did not evaluate whether they—in addition to or instead of Virgin's alleged misconduct—caused the second album to underperform. *See* Kolbrenner Dep. (Docs. 86-3 & 86-4) at 90-96, 145. Given this significant gap in Kolbrenner's knowledge and analysis, he cannot testify with the reliability demanded by Rule 702 either that Virgin caused Victory's alleged losses or that it is "reasonable to assume" that Virgin did so. *See F:A J Kikson v. Underwriters Labs., Inc.*, 492 F.3d 794, 802 (7th Cir. 2007) (expert's testimony was insufficient where he "did not account for factors

distinguishing" past sales from future sales); *Gordy Co. v. Mary Jane Girls, Inc.*, 1989 WL 149290, at *5 (S.D.N.Y. Dec. 6, 1989) (noting "the fickle nature of popular support" for recording artists).

In sum, because Victory has failed to satisfy its burden of showing that Kolbrenner's testimony satisfies Rule 702, the testimony is excluded. Victory expresses concern that excluding Kolbrenner will leave it unable to "adequately quantify its lost-profit damages in a way easily understood by the jury" and will require the court to "try this case in a vacuum." Doc. 90 at 10-11. That is not necessarily true. Rule 701 permits "the owner or officer of a business to" present lay opinion testimony regarding "the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert." Fed. R. Evid. 701 Advisory Comm. Notes (2000 amends.) ("Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business."). The parties have yet to brief, and the court has yet to decide, whether Victory CEO Anthony Brummel may offer such testimony. *See generally Von der Ruhr v. Immtech Int'l, Inc.*, 570 F.3d 858, 862 (7th Cir. 2009); *Compania Administradora de Recuperacion de Activos Administradora de Fondos de Inversion Sociedad Anonima v. Titan Int'l, Inc.*, 533 F.3d 555, 560-61 (7th Cir. 2008); *Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*, 320 F.3d 1213, 1222-23 (11th Cir. 2003); *Miss. Chem. Corp. v. Dresser-Rand Co.*, 287 F.3d 359, 373-74 (5th Cir. 2002); *Teen-Ed, Inc. v. Kimball Int'l, Inc.*, 620 F.2d 399, 403 (3d

Cir. 1980). Regardless of how that issue is resolved, however, responsibility for Kolbrenner's exclusion and the consequences (if any) thereof lies solely with Victory, his proponent.

February 3, 2011 _____
United States District Judge